IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|                              |   |                              |
|------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA,    | * |                              |
|                              | * |                              |
|         Plaintiff,           | * |                              |
|                              | * |                              |
|         v.                   | * | Criminal No.: WDQ-11-0516    |
|                              | * |                              |
| PEDRO RODRIGUEZ GARCIA,      | * |                              |
|                              | * |                              |
|         Defendant.           | * |                              |
|                              | * |                              |

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Pedro Rodriguez Garcia ("Rodriguez") is charged in a three-count indictment with Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 1951(a), and using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  ECF Nos. 3, 5.[1]  On December 17, 2012, Rodriguez waived his Sixth Amendment right to a jury, and the Government consented to proceeding with a bench trial.  ECF No. 54.[2]  The bench trial began on Monday, February 25, 2013, and closing arguments were heard on Wednesday, March 13, 2013.  By way of the accompanying Verdict, and for the following

---

[1] The indictment was initially filed on September 13, 2011, and appears to have been refiled on September 27, 2011.  ECF Nos. 3, 5.  Rodriguez is also charged with aiding and abetting the robbery and firearm offenses (Counts Two and Three), in violation of 18 U.S.C. § 2.  *See id.*

[2] *See also* ECF No. 72.

reasons, this Court will find Defendant Pedro Rodriguez Garcia guilty on all counts.

I.  Findings of Fact

This case arises out of a series of commercial and home invasion robberies in the Baltimore area between July and September 2009.  As required by Fed. R. Crim. P. 23(c), the Court makes the following findings of fact:[3]

1.  In early 2009, Nikolaos (a/k/a "Nick") Mamalis and Daniel Chase met at the Trump Plaza hotel in Atlantic City, New Jersey.  Mar. 26, 2013 Rough Trial Tr. 152-53.

2.  Chase regularly visited the Trump Plaza hotel, where he had a player's account.  *Id.* at 153.

3.  Mamalis owned a pizza shop in or around Bel Air, Maryland, but was struggling financially.  *Id.* at 154.

4.  Chase and Mamalis developed a plan to rob acquaintances of Mamalis who were known to run cash businesses.  *Id.*

5.  Chase and Mamalis later met in Baltimore, Maryland, where Mamalis introduced Chase to George Laloudakis, Evangelos Tsoukatos, and--eventually--Antowan Bell.  *Id.* at 156.

---

[3] The facts are taken from this Court's recollection of trial testimony, the rough or preliminary trial transcript ("Rough Trial Tr."), and trial exhibits.

2

6.   Mamalis got Rodriguez's contact information from an employee. *Id.* at 151.[4]

7.   Mamalis and Chase first met Rodriguez in person in mid-July 2009, and decided to include him in the operation as a side man. *Id.* at 151-52.[5]

8.   On July 20, 2009, Rodriguez and Mamalis bought a prepaid wireless phone from a Wal-Mart store in Nottingham, Maryland (410-842-5120, the "410 cell"). *E.g.*, Mar. 25, 2013 Rough Trial Tr. 148-58, 164.

9.   On July 24, 2009, Rodriguez went to another Wal-Mart store in Baltimore County, Maryland, where he purchased a second prepaid phone (559-359-5365, the "559 cell"), dress pants, a dress shirt, tread safe shoes (used by restaurant kitchen employees), and other items. *Id.* at 127, 129, 141, 144-48.

10.  Rodriguez, Chase, and Mamalis communicated with each other using these phones and other wireless phones registered to Chase and Mamalis's wife. *Id.* at 158-60.

11.  Sometime in 2009, Chase, Mamalis, Laloudakis, Tsoukatos, and Rodriguez decided to rob Constantine (a/k/a "Dino") Frank. Mar. 26, 2013 Rough Trial Tr. 157.

---

[4] In 2009, Rodriguez was a kitchen employee at Ms. Shirley's and S'ghetti Eddie's. Mar. 25, 2013 Rough Trial Tr. 246, 283, 287.

[5] Chase testified that he needed a younger, stronger assistant because of his poor physical health. *E.g.*, Mar. 26, 2013 Rough Trial Tr. 252, 254-56.

12.  Mamalis knew Frank from previous business and social
     dealings, and had borrowed money from Frank in the past.
     Mar. 25, 2013 Rough Trial Tr. 56.

13.  Frank was the owner of Precision Vending, a vending machine
     distribution and servicing company located at 1001 South
     Lakewood Avenue in Baltimore, Maryland.[6]  *Id.* at 29.

14.  Mamalis initially intended to rob Frank at home, where
     Frank was believed to have stored $10 million in cash.
     Mar. 26, 2013 Rough Trial Tr. 157.

15.  After another robbery plan was ruled out as impractical,[7]
     Mamalis decided to rob Precision Vending with Chase and
     Rodriguez.[8]  *Id.* at 160, 280.

---

[6] Precision Vending purchased its vending machines from Betson,
also a Maryland company.  Mar. 25, 2013 Rough Trial Tr. 30-31.
Precision Vending purchased snack foods, candy, and soda
products from companies including Vend Central and the Virginia
location of Vendors Supply.  *Id.* at 31.  The products purchased
included Snyder's pretzels, Hershey's candy bars, and Utz potato
chips.  *Id.*  Snyder's and Hershey's are based in Pennsylvania.
*Id.*

[7] Chase and Rodriguez surveilled a prospective victim, Eric
Cantor, together for several days.  Mar. 26, 2013 Rough Trial
Tr. 158-60.

[8] Because of his relationship with Frank, Mamalis had visited
Precision Vending about 20 times and was familiar with the
physical layout of the premises, including the "money room,"
which Precision Vending employees used to combine, count, and
store the business's daily proceeds pending a weekly trip to the
bank.  Mar. 25, 2013 Rough Trial Tr. 43-45, 55, 57.  Mamalis
shared this information with Chase.  Mar. 26, 2013 Rough Trial
Tr. 162-63.

16. Chase and Mamalis spent two days planning the Precision Vending robbery. *Id.* at 161, 164, 278.

17. Rodriguez was aware of the plan to rob Precision Vending at least two days before the robbery, but Chase did not share all the details with Rodriguez until the day of the robbery. *Id.* at 164-65, 169.

18. On the morning of July 29, 2009, Chase picked up Rodriguez, and the two met Mamalis for breakfast and to discuss the robbery. *Id.* at 173-74.

19. Mamalis gave Chase and Rodriguez a firearm to use in the robbery. *Id.* at 180.

20. Sometime in the afternoon, Chase and Rodriguez drove to Precision Vending and surveilled the premises for about one and one half hours from a parking lot across the street. *Id.* at 176.

21. After Frank's secretary had left, Chase and Rodriguez drove out of the parking lot and parked in front of Frank's car. *Id.* at 178-79.

22. Chase loaded the firearm and gave it to Rodriguez. *Id.* at 180-82.

23.  Disguised as package deliverymen, Chase and Rodriguez carried a false package[9] up to the building and buzzed the intercom.  *Id.* at 182-83.

24.  Frank admitted Chase and Rodriguez into the building, and Chase led the way upstairs.  *Id.* at 183-84.

25.  After Chase and Rodriguez found Frank, Rodriguez brandished the gun to keep Frank in place; Chase put on latex gloves, handcuffed Frank, and asked Frank where the money was.  *Id.* at 186-87, 190.

26.  Chase left Rodriguez with Frank and went to the money room.  *Id.* at 189-90.

27.  Chase spent about an hour collecting over $10,000 in paper currency and looking for money in other locations.  *Id.* at 193, 196-97, 261.

28.  Before leaving the building, Chase and Rodriguez taped Frank's feet with duct tape, replaced the handcuffs with zip ties, and placed Frank on the floor.  *Id.* at 198.

29.  After Chase and Rodriguez had driven out of Baltimore City and were on I-95, at about 6:13 p.m., Chase used the 559 cell to anonymously call one of Frank's other businesses, a pool hall called the "Top Hat Cue Club."  *Id.* at 200-01; Mar. 25, 2013 Rough Trial Tr. 72-74, 122-24.

---

[9] The box contained, among other things, zip ties, handcuffs, and duct tape.  Mar. 26, 2013 Rough Trial Tr. 181.

30.  Chase informed shift manager Wayne Jeffrey Rubin, who
     answered the phone, that Frank wasn't "doing so good."[10]
     Mar. 25, 2013 Rough Trial Tr. 74.

31.  Rubin asked who was calling but there was no response. *Id.*

32.  After Rubin's efforts to contact Frank were unsuccessful,
     Rubin called Frank's brother-in-law Thomas Zizos, who
     called the police. *Id.* at 75-76, 84.

33.  At about 8:00 p.m., Baltimore City police officer Anthony
     Zayas responded to Precision Vending to check on Frank.
     *Id.* at 84.

34.  Officer Zayas found Frank about four to five minutes after
     entering the building, in the second-floor vestibule. *Id.*
     at 88.

35.  Frank was lying on his stomach.  Frank had freed one of his
     arms from the zip ties, but his legs remained bound. *Id.*
     at 89, 95-96.

36.  When asked if he had been robbed, Frank nodded but was
     unable to speak. *Id.* at 89.

37.  Frank died 13 days later, on August 11, 2009. *E.g.*, *id.* at
     117.

---

[10] After Chase made the call, Rodriguez, Chase, and Mamalis met
in a rest area on I-95 to exchange the money and return the gun,
and then drove to the Trump Plaza hotel in Atlantic City, New
Jersey.  Mar. 26, 2013 Rough Trial Tr. 202-03, 207.  Several
days later, all three men returned to Baltimore, Maryland.  *Id.*
at 208-09.

38.   The autopsy report concluded that Frank's death was caused
      by "intracerebral hemorrhage associated with an assault."[11]
      Gov't Ex. 33.

39.   Frank's death was ruled a homicide.  *Id.*; Mar. 25, 2013
      Rough Trial Tr. 119.

40.   Chase and Mamalis committed additional, home invasion
      robberies on September 2 and 29, 2009, with Laloudakis and
      Bell, respectively.  Mar. 25, 2013 Rough Trial Tr. 194-95;
      Mar. 26, 2013 Rough Trial Tr. 209-11, 268.

41.   During an investigation into these robberies, the Circuit
      Court for Baltimore City issued wiretap authorizations for
      authorities to monitor Chase and Mamalis's cell phone
      calls.  Mar. 25, 2013 Rough Trial Tr. 185-86, Mar. 27, 2013
      Rough Trial Tr. 49-50.

42.   The investigation led to Chase, Mamalis, Bell, Tsoukatos,
      and Laloudakis's arrest and prosecution.  Mar. 27, 2013
      Rough Trial Tr. 49-51.

43.   On November 24, 2009, Chase, Mamalis, Tsoukatos, and Bell
      were charged with Hobbs Act conspiracy in Criminal Case No.
      RDB-09-0608.[12]  No. RDB-09-0608, ECF No. 35.

---

[11] Precision Vending and the Top Hat Cue Club were sold to other
businesses after Frank's death.  Mar. 25, 2013 Rough Trial Tr.
60-61, 79.  As of about six months ago, the Precision Vending
building was unoccupied.  *Id.* at 70.

44.  On March 2, 2010, Laloudakis was added to the second
     superseding indictment.  No. RDB-09-0608, ECF Nos. 67, 69.

45.  On March 30, 2010,[13] Chase identified a photograph of
     Rodriguez as "the man he knew as 'Pedro,'" who had assisted
     in the Precision Vending robbery.

46.  Chase testified that he was shown two or three photographs,
     from which he identified Rodriguez by his face and
     hairline.  Mar. 26, 2013 Rough Trial Tr. 224-26.

47.  With the exception of Mamalis, all defendants pled guilty.
     No. RDB-09-0608, ECF Nos. 108, 131, 144, 148.

48.  Mamalis was convicted after a jury trial, on February 3,
     2011.  No. RDB-09-0608, ECF No. 172.

49.  On September 13, 2011, Rodriguez was indicted in the
     instant case.  ECF No. 3.

II. Conclusions of Law

   A. Pretrial Motion to Suppress (ECF No. 31)

     Rodriguez moved to "suppress" any identification of him by
the Government's cooperating witness, Chase,[14] as well as "any

---

[12] The case was Judge Legg's; Laloudakis's § 2255 petition was
recently reassigned to Judge Bennett.

[13] According to the affidavit in support of the criminal
complaint, the identification occurred on March 30, 2010.  ECF
No. 1 at 10.  In its opposition to Rodriguez's motion to
suppress the identification, the Government stated that the
identification occurred on February 24, 2010.  ECF No. 32 at 6.

[14] See ECF No. 32 at 5-7.

evidence that [Chase] identified [Rodriguez] as a participant in the conspiracy at issue in this action." ECF No. 31; ECF No. 31-1 at 1. The Government countered that the relevant identification was not suggestive and "comported with the standards of due process." ECF No. 32 at 7. The Government concluded that evidence of the pretrial identification and any in-court identification "should be admitted at trial without limitation." *Id.*

1. Evidence of Pretrial Identification

Rodriguez asserted that the Government's discovery materials did not indicate that Chase selected his photograph from a "proper" photographic array. ECF No. 31-1 at 2. "Absent such information," Rodriguez asserted that this Court should "presume" that he did not. *Id.* The Government countered that Chase knew Rodriguez from the time they spent together planning, executing, and fleeing from the Precision Vending robbery. ECF No. 32 at 8.

Exclusion of pretrial identifications requires a showing that the identification procedures were "impermissibly suggest-ive." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). "A procedure is unnecessarily suggestive if a positive identifica-tion is likely to result from factors other than the witness's own recollection of the crime." *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997). If the procedure was impermissibly

suggestive, the court must then determine whether the pretrial
identifications were reliable under the totality of the
circumstances. *Manson*, 432 U.S. at 114-17.   Factors to consider
include: (1) the witness's opportunity to view the accused at
the time of the crime, (2) the witness's degree of attention,
(3) the accuracy of the witness's prior description of the
accused, (4) the level of certainty by the witness; and (5) the
length of time between the crime and confrontation.   *Neil v.
Biggers*, 409 U.S. 188, 199-200 (1972).

The exclusion of identification evidence is a "drastic
sanction" that should be "limited to identification testimony
which is manifestly suspect."   *Harker v. Maryland*, 800 F.2d 437,
443 (4th Cir. 1986).   Evidence that does not give rise to a
substantial likelihood of irreparable misidentification should
be left for the trier-of-fact to weigh.   *See Manson*, 432 U.S. at
116 ("[E]vidence with some element of untrustworthiness is
customary grist for the jury mill.").

The identification procedure was suggestive because Chase
was shown only one photograph instead of an array.   ECF No. 31-1
at 4.   However, the pretrial identification is nevertheless
admissible because it satisfied the *Biggers* reliability factors:
Chase had the opportunity to observe Rodriguez before, during,
and after the robbery, and Chase was paying attention to the
events leading up to the robbery.

Chase testified that he spent a significant amount of time with Rodriguez before, during, and after the Precision Vending robbery, and that his identification of Rodriguez was based on his memory of these numerous interactions.  Chase expressed "absolute certainty" about his identification, and the period of time between the robbery and identification was only about seven months.  Chase's pretrial identification of Rodriguez is reliable.  *See Biggers*, 409 U.S. 188, 199-200.

2. In-Court Identification

An in-court identification is permissible only if it is untainted by an improper pretrial identification.  *United States v. Crews*, 445 U.S. 463, 471-73 (1980).  The defendant must show an impermissibly suggestive pretrial identification.  *See id.*  If he does, the Government must prove by clear and convincing evidence that the in-court identification is "based upon observations of the suspect other than [the photo array]."  *United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995).  Chase's pretrial identification of Rodriguez was suggestively procured, but the Government has proved, by clear and convincing evidence, that Chase's in-court identification of Rodriguez was based on observations other than the photo array: the time they spent together before, during, and after the robbery at issue.

Thus, Rodriguez's motion to suppress will be denied.[15]

B. Count One: Hobbs Act Conspiracy (18 U.S.C. § 1951(a))

The Hobbs Act prohibits robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). To establish a conspiracy to commit Hobbs Act robbery, the Government must prove that the defendant agreed with at least one other person to commit acts that would have constituted a Hobbs Act robbery had the acts been committed. *United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir. 1990). The elements of a Hobbs Act robbery are (1) robbery, and (2)

---

[15] Pending are other pretrial motions, which can be disposed of summarily. First, Rodriguez's *ex parte* motion for writs of habeas corpus *ad testificandum* as to alleged coconspirators Tsoukatos and Bell (ECF No. 63) will be denied as moot. Also pending are two related motions concerning a traffic citation purportedly issued to Rodriguez on July 27, 2009 in Mazatlan, Sinaloa, Mexico by Officer Gabino Pinzon. The Government moved *in limine* to exclude the citation (ECF No. 66); Rodriguez moved to sanction the Government (ECF No. 65) for failing to timely disclose an FBI agent's October 3, 2012 report deeming the citation valid. Specifically, Rodriguez requested the Court to exclude all of the Government's evidence relating to its investigation of the citation's validity. Because neither party established that the citation was authentic or self-authenticating, this Court did not consider it--or evidence relating to it--in reaching its decision. Fed. R. Evid. 901, 902(3). Further, the Court did not find Rodriguez's alibi witnesses--Luis Alberto Lizzarraga Tirado and Alfredo Rodriguez Marroquin-- to be credible.

The Government's motion to exclude (ECF No. 66) will be granted; Rodriguez's motion for sanctions (ECF No. 65) will be denied as moot.

interference with commerce.  *Stirone v. United States*, 361 U.S. 212, 218 (1960).

The Government has proved, beyond a reasonable doubt, that Rodriguez entered into an agreement with Chase and Mamalis to rob Precision Vending on July 29, 2009.  Rodriguez's role in the robbery was to brandish a loaded firearm, to ensure Frank's compliance while coconspirator Chase looked for money to steal. As discussed below in greater detail, the Precision Vending robbery--as planned and executed--met the elements of Hobbs Act robbery.  Thus, Rodriguez is guilty on Count One.

C. Count Two: Hobbs Act Robbery (18 U.S.C. § 1951(a))

As stated above, the two elements of a Hobbs Act crime are (1) robbery or extortion, and (2) interference with commerce. *Stirone*, 361 U.S. at 218.

1. Robbery

Hobbs Act robbery is defined, in relevant part, as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession."  18 U.S.C. § 1951(b)(1); *see also United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir. 1990) (to establish a Hobbs Act robbery, the Government must prove that the defendant coerced the victim to part with property, and that

14

the coercion occurred "through the wrongful use of actual or threatened force, violence or fear or under color of official right" (internal quotation marks omitted)).

The Government has proved, beyond a reasonable doubt, that Rodriguez knowingly obtained Precision Vending's cash proceeds by threatening business owner Frank with a loaded firearm. Further, Frank was so frightened by the encounter that he could not speak when the police arrived to rescue him.  Mar. 25, 2013 Rough Trial Tr. 89.  Thus, Rodriguez committed "robbery" as defined by the Hobbs Act.

2. Interference with Commerce

The Hobbs Act's jurisdictional predicate is satisfied when the robbery has a "minimal effect" on interstate commerce.[16]  A robbery has a "minimal effect" on interstate commerce when it depletes the assets of an "inherently economic enterprise." *United States v. Tillery*, 702 F.3d 170, 174 (4th Cir. 2012) (internal quotation marks omitted).  When determining whether a robbery had a minimal effect on interstate commerce, we do not look at the impact of the immediate offense, but "whether the relevant class of acts has such an impact."[17]  The impact on

---

[16] *United States v. Williams*, 342 F.3d 350, 354 (4th Cir. 2003) (*citing United States v. Spagnolo*, 546 F.2d 1117, 1119 (4th Cir. 1976))..

[17] *Williams*, 342 F.3d at 355 (*citing United States v. Marrero*, 299 F.3d 653, 655 (7th Cir. 2002)).

commerce may be shown by "proof of probabilities without evidence that any particular commercial movements were affected." *United States v. Brantley*, 777 F.2d 159, 162 (4th Cir. 1985).

Here, the Government proved beyond a reasonable doubt that Precision Vending had an interstate commerce connection. *Williams*, 342 F.3d at 354-55. First, Precision Vending purchased snack foods, candy, and soda products from at least one out-of-state supplier. Mar. 25, 2013 Rough Trial Tr. 31. Second, the products purchased included Snyder's pretzels and Hershey's candy bars--both of which are created by Pennsylvania companies. *Id.* Thus, when Rodriguez obtained money from Precision Vending's money room, he depleted the assets of an "inherently economic enterprise." *Tillery*, 702 F.3d at 174 (internal quotation marks omitted). The Hobbs Act's jurisdictional requirement was satisfied. *Id.* at 174-75. The Court will find Rodriguez guilty on Count Two.

D. Count Three: Using and Carrying a Firearm During or in Relation to a Crime of Violence (18 U.S.C. § 924(c))

18 U.S.C. § 924(c)(1) provides, in relevant part:

Whoever, during and in relation to any crime of violence . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence . . . be sentenced to imprisonment for five years.

16

"Courts broadly construe the term 'use' under § 924(c)." *United States v. Thompson*, 23 F.3d 404 (Table), 1994 WL 120984, at *2 (4th Cir. 1994) (per curiam). "Sufficient evidence exists for a § 924(c) conviction if a weapon was available for use during or immediately following the crime, increased the likelihood of the success of the crime, or if it facilitated the crime by giving its possessor courage."[18] "A gun need not be used offensively to support a § 924(c) conviction." *Thompson*, 1994 WL 120984, at *2.[19]

The Government proved, beyond a reasonable doubt, that Rodriguez carried a loaded firearm for the duration of the Precision Vending robbery. The agreed-upon purpose of the firearm was to intimidate Frank, thereby ensuring his acquiescence in the robbery. The Court will find Rodriguez guilty on Count Three.

---

[18] *Thompson*, 1994 WL 120984, at *2 (*citing United States v. Caldwell*, 985 F.2d 763, 765 (5th Cir. 1993); *United States v. White*, 985 F.2d 271, 273 (6th Cir. 1993); *United States v. Hager*, 969 F.2d 883, 888-89 (10th Cir.), *cert. denied*, 506 U.S. 964 (1992); *United States v. Vasquez*, 909 F.2d 235, 239 (7th Cir.1990), *cert. denied*, 501 U.S. 1217 (1991)).

[19] *See also United States v. Payero*, 888 F.2d 928, 929 (1st Cir. 1989) (§ 924(c) conviction will be upheld if "possessor of a weapon intended to have it available for possible use during or immediately following the transaction, or if it facilitated the transaction by lending courage to the possessor").

III. Conclusion

For the reasons stated above, the Court will find the Defendant Pedro Rodriguez Garcia guilty on all counts.

_____3/13/13_____
Date

_____
William D. Quarles, Jr.
United States District Judge

18